WATERFALL, ECONOMIDIS, CALDWELL,
   HANSHAW & VILLAMANA, P.C.
Williams Centre, Suite 800
5210 E. Williams Circle
Tucson, AZ 85711-4482
(520) 745-7810

Barry Kirschner/SBN 005592
bkirschner@wechv.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Jane A. Weiland,<br>        Plaintiff,<br><br>vs.<br><br>Hartford Life and Accident<br>Insurance Company; and TMC<br>Healthcare Group Benefit Plan,<br>        Defendants. | No.:<br><br>**COMPLAINT** |

Plaintiff Jane A. Weiland ("Weiland") alleges:

1. Weiland is a participant and claimant in the TMC Healthcare Group Benefit Plan ("TMC Plan").

2. Defendant TMC Plan is a disability benefit plan governed pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U. S.C. § 1101 *et seq*. This Court has jurisdiction. 29 U.S.C. § 1132.

3. Defendant Hartford Life and Accident Insurance Company ("Hartford") is an insurance company which agreed to provide disability insurance benefits and perform as the Claim Administrator of the TMC Plan.

4. Weiland is an intended beneficiary and participant of the protections of the TMC Plan as administered through Hartford.

5. The United States Congress described its purpose in enacting ERISA in 1974:

   "It is hereby declared to be the policy of this chapter to protect

> interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2, 29 U.S.C. § 1001(b)

6. Weiland was born May 10, 1952.

7. Weiland was employed with Tucson Medical Center ("TMC") for almost thirty five years.

8. Weiland was promoted to Senior Clinical Systems Analyst for TMC. She earned a salary of $5,985.20 per month.

**WEILAND HAS BEEN RECOGNIZED AS DISABLED SINCE 2006.**

9. Weiland has been unable to work since June 15, 2006.

10. Weiland applied for long-term disability benefits. Her claim for total disability benefits was accepted in 2006.

11. The disability benefits reflected an onset of disability by June 14, 2006.

12. Weiland has been recognized as totally and permanently disabled by the United States Social Security Administration ("SSA") since 2006.

13. SSA continues to pay Social Security Disability Insurance ("SSDI") benefits to Weiland because she is permanently and totally disabled.

14. Weiland performed a responsible administrative position for many years prior to the onset of her disability.

15. Weiland would be "gainfully" employed consistent with the TMC Plan only if she could work full time with reasonable continuity in an occupation appropriate for her education, training, and experience with earnings of $3,591.12 per month or greater.

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

2

*Weiland v. Hartford*
CV New

16. Hartford terminated Weiland's benefits effective September 2010 after paying disability benefits for four years.

17. Weiland timely appealed her termination of benefits. Her appeal (without exhibits) is Exhibit 1 to the Complaint.

18. Weiland has exhausted her administrative remedies before seeking relief in this Complaint.

**WEILAND'S TREATING PHYSICIANS AGREE THAT SHE IS DISABLED FOR MEDICAL REASONS FROM FULL-TIME EMPLOYMENT.**

19. Weiland's medical conditions include: osteopenia, generalized osteoarthritis, cervical spondylosis, end stage right knee osteoarthritis, chronic pain, renal insufficiency, fibromyalgia, and sleep apnea.

20. Donald L. Kwasman, D.O. ("Dr. Kwasman") has treated Weiland for 30 years and firmly believes that Weiland is disabled for medical reasons from performing full-time employment.

21. Stephen J. Harkins, D.D.S. ("Dr. Harkins") has treated Weiland for 20 years and firmly believes that Weiland is disabled for medical reasons from performing full-time employment.

22. Linda A. Karl, M.D. ("Dr. Karl") is a rheumatologist who has treated Weiland for 15 years and firmly believes that Weiland is disabled for medical reasons from performing full-time employment.

23. Beverly Webber, FNP-C ("Webber") concurred with Dr. Kwasman's July 5, 2010 assessment of Weiland's deteriorating condition and diagnosed pain disorder associated with psychological factors and a general medical condition.

24. Webber answered "no" when Hartford asked if Weiland could functionally perform activities 40 hours a week in June 2010.

///

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

3

*Weiland v. Hartford*
CV New

**WEILAND REQUIRES POWERFUL MEDICATIONS TO TREAT HER MULTIPLE CONDITIONS.**

25. To clarify the magnitude of the medications and their predictable side effects, Weiland submitted an opinion from occupational expert Marcy Tigerman ("Tigerman") which included a detailed chart of medications prescribed for and taken by Weiland.

26. Tigerman's credentials include education and training with a Masters of Science in Rehabilitation Counseling, and professional experience as a Rehabilitation Specialist, Vocational Rehabilitation Counselor, Workers Compensation Rehabilitation Case Manager, and Labor Market Consultant.

27. Tigerman conducted a personal interview of Weiland in preparation for forming opinions and placing those opinions in her report.

28. Tigerman concluded that the combination of sedating medications along with the fatigue from her fibromyalgia, chronic pain, and her sleep apnea combine to form a picture of someone who is chronically fatigued. Tigerman's report further cites Dr. Kwasman who states that the volume of medication taken by Weiland makes her incapable of fulfilling employment possibilities.

29. Tigerman's chart shows:

| Medication | Dosage | Frequency | Purpose | Side effects |
| --- | --- | --- | --- | --- |
| Methadone | 10mg | 15 per day: 5 in the morning, 5 at mid day 5 at night | Moderate to severe pain | Dizziness, lightheadedness |
| Vicodin | 10mg/325 mg | Every 4-6 hours, 4x a day | Breakthrough pain | Dizziness, lightheadedness, sedation |
| Clonazepam | .5mg daily | 1 per day | Panic disorder | drowsiness |
| Cymbalta | 60 mg | 2x/day | Depression, fibromyalgia | Nausea, headache, dry mouth, fatigue, somnolence |
| Dilitiazem HCL ER 12hr | 120 mg | 2x/day | hypertension | Lower limb edema, dizziness, fatigue |
| Lidoderm patch | 5% | 2/day x 12 hours | Pain management | Dermatitis, will |

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

|  |  | as needed | for moderate to severe chronic pain | switch to Voltaren gel if needed |
|---|---|---|---|---|
| Ranitidine | 300 mg | 1 at bedtime | Ulcer | Dizziness, malaise, somnolence, insomnia depression |
| Ropinirole | 3mg | 1 at bedtime | Restless leg | dizziness |
| Synthroid | .1 mcg | 1x/day | hypothyroidism | fatigue |
| Voltaren gel | 1% | 3x/day | Osteoarthritis pain | Dermatitis |

30. On information and belief, Hartford never sent the Tigerman report to its medical vendor reviewing panel.

31. If any member of the reviewing panel received Tigerman's report, they did not consider it important enough to respond to in their written analysis of Weiland's disability, or the effects of Weiland's prescribed medications on her ability to maintain professional employment on a continuous basis.

32. In 2010, as Hartford was concluding that Weiland could work with continuity in full-time responsible employment commensurate with her education and training, orthopedic surgeon Jay A. Katz, M.D. ("Dr. Katz") was treating Weiland in anticipation of knee replacement surgery which eventually took place March 28, 2011.

33. Weiland's history of surgery includes: June 2006, C3-C7 posterior laminectomy; September 2005, right knee meniscus and micro fracture surgery; July 2005, L3-4 laminectomy; February 2001, left total hip replacement; September 1995, right wrist arthroplasty; July 1990, right and left TMJ arthroplasty; September 1988, right knee lateral release; and July 1978, left knee lateral release.

34. Medicines prescribed and taken by Weiland as of 2010 include: Methadone, Vicodin, Clonazepam, Cymbalta, Dilitiazem HCL ER 12hr, Lidoderm patch, Ranitidine, Ropinirole, Synthroid, and Voltaren gel.

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ  85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

5

*Weiland v. Hartford*
CV New

35. The recognized side effects of the medicines are extensive: Dizziness, fatigue, lightheadedness, drowsiness, nausea, headache, dry mouth, somnolence, lower limb edema, dermatitis, malaise, insomnia, and depression.

36. Treating physician Dr. Kwasman stated by letter of January 25, 2011:

> "It is clear and predictable that a woman of her small stature, who is taking the volume of powerful medication necessary to control pain and inflammation, would definitely not be in a position to fulfill a responsible position of employment on a full time basis."

37. Dr. Harkins stated on March 10, 2011:

> "She has been taking large doses of opiate pain medication (Methadone and Vicodin) to manage her pain. In addition to taking long term opiate medication, she demonstrates cognitive impairment from these medications and chronic sleep disturbance caused by obstructive sleep apnea and pain modulated sleep disturbance. These conditions have a significant negative effect on her ability to work."

38. Philip S. Eichling, MD, MPH, FASSM ("Dr. Eichling") diagnosed Weiland with sleep apnea. His study concluded that Weiland used mechanical assistance from a breathing machine to breathe 22% of her breaths while sleeping.

39. Dr. Eichling concluded:

> "Most of her sleep disorder, which is a combination of obstructive apnea plus central apnea, is related to her medication use from methadone and Vicodin. These suppress breathing and have created this problem. She is having to use the BiPAP to support her use of her pain medication."

40. Hartford dismissed the effects of medications as preventing Weiland from reliably performing a 40 hour per week job by stating:

> "While Ms. Weiland and some of her treating physicians indicate that she is unable to work due to the effects from medications, the medical records do not provide documentation consistent with functional impairment, restrictions or limitations related to the use of medication during the routine evaluations that would have precluded Ms. Weiland's ability to function or work as of 9/29/10."

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

6

*Weiland v. Hartford*
CV New

41. By ignoring or dismissing the chart and commentary of Tigerman and treating physicians about the effect of medications prescribed for Weiland, Hartford's vendor doctors and claims department evidence their closed mindedness to evidence which tends to prove that the disability which had been recognized for years for a series of progressive diseases continued to be disabling.

**WEILAND'S DEGENERATIVE DISEASES AND CONDITIONS.**

42. Osteopenia is reduced bone density which is a marker for risk of fractures. Those with osteopenia are more vulnerable to bone fracture and disease.

43. Dr. Karl's records indicate increasing difficulty in managing Weiland's arthritis, including in her hands. By 2009, Dr. Karl prescribed a custom splint, a temporary ameliorative of injections, and considered referral for hand surgery.

44. Weiland suffers from osteopenia.

45. Dr. Karl's medical record from October 16, 2006 states:

> "The patient has probably the most severe osteoarthritis I have seen in the cervical spine which has been progressive. Although surgery was successful from the standpoint of relieving nerve compression it has not improved her cervical pain. I think pain medication and the pain program is very appropriate for her in the hopes of getting her back to work."

46. Dr. Karl reviewed imaging performed in May 2011 and concluded that, between 2007 and May 2011, there were extensive arthritic changes evidencing a progression of erosive osteoarthritis in wrists and hands, and joint space narrowing where there was essentially "bone on bone" in Weiland's left great toe.

47. Hartford was aware of the MRI and its confirmation that there had been extensive erosion to hands, wrists, and the left great toe of Weiland, as reflected in its claim diary entry of June 1, 2011.

48. Treating physician Dr. Kwasman has repeatedly expressed opinions that Weiland

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ  85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

7

*Weiland v. Hartford*
CV New

1   is disabled, and suffering from <u>progressive</u>, worsening conditions.  In a July 5,
2   2010 letter, Dr. Kwasman specifically noted his 30 years of treatment for
3   Weiland and a steady decline in her physical health over the past 4 to 5 years.

49. Treating physician and pain specialist Dr. Harkins has followed Weiland since 1990.  Dr. Harkins states his opinion that Weiland has chronic incurable <u>degenerative</u> changes in her jaw and spine.

50. Hartford and its hired medical panel from MES Solutions dismissed as not important the fact that a progressive illness is expected to deteriorate over time, and that Weiland's major conditions are the type which are not likely to see major improvement over time.

**TESTIMONY FROM WEILAND'S COLLEAGUES WAS IGNORED BY HARTFORD.**

51. Weiland filed an appeal to Hartford's termination of long-needed benefits.  As part of her appeal, she submitted statements from responsible persons who have witnessed Weiland's medical deterioration, especially since 2005.

52. Hartford did not send to its medical vendors the multiple witness statements of colleagues and observers of Weiland over the years which establish objective eyewitness evidence of Weiland struggling with the most essential elements needed for performance of her duties because of her physical problems.

53. The statement from Donna M. Fulton, M.D. stated in part:

> "She has visible arthritis in her hands and had a number of issues with her neck.  I also recall her bringing a special mattress to sleep on for comfort when we traveled."

54. Patricia Marr stated in part regarding Weiland:

> "Lastly, as Jane's health continued to degrade, she still wanted to participate in the respiratory care conversion to a new electronic documentation system. She assisted me with the new build process, testing and validation. When it came time to implement Jane came in for the switch over and had hoped to assist with some simple tasks such as entering

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ  85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

8

*Weiland v. Hartford*
CV New

orders. It was at this time that I really recognized how compromised she had become. She sat in a chair to help with order entry but it was difficult for her to concentrate on the task, as she appeared to lose sense of focus, staring at the screen. She seemed almost tearful as she really was in too much pain to sit upright for any length of time. After a few hours she left unable to endure much more. It saddened me to know how much she loved working and particularly on projects of this magnitude. She took great pride in the work she performed and I am grateful for all she has taught me and has given to this department and organization."

55. Diane Plante stated in part regarding Weiland:

"She made one more attempt in November 2008, when we transitioned RT from Clinivision to EPIC Software. Jane's knowledge of EPIC and her past involvement in RT (Jane was a manager and heavily involved in the RT Clinivision software system) made her a valuable asset- but she was too weak and unable to think clearly due to her meds. She continued to lose weight and was very fragile and had maybe a few good hours a day, but was never strong enough to work again."

56. Monna Sebring stated in part regarding Weiland:

"Jane was such an important member of our team. We were all extremely saddened to watch her health deteriorate to the point where she was no longer physically able to perform her job. She tried so hard to continue working but it was obvious that she was in a great deal of pain. She began to miss long periods of work due to surgeries and illness. She began to have to use wrist splints while doing her computer work. She was unable to remain in a sitting position for long periods due to her neck pain. Once she came into the office and we had to find some exercise mats and make a place for her to lie down. Jane was such a devoted team member that she even worked from home while on bed rest for a time. We took turns making grocery and supply runs for her because she was unable to do daily chores like shopping and was unable to lift anything heavy. A group of us came to her home and did housecleaning for her because she was unable to take care of the house."

57. Kathleen Sands stated in part regarding Weiland:

"Jane now drives her car much less than she used to. Margaret often drives Jane's car now, with Jane sitting in the back seat so she can lean against the side of the car more comfortably. When Jane does drive now, her posture is unusual. Rather than aligning her spine with her pelvis to

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

9

*Weiland v. Hartford*
CV New

sit upright, she now leans back considerably. She seems to be uncomfortable most of the time when she's sitting."

58. Valerie Sotomayor stated in part regarding Weiland:

"In November of 2008 we implemented the respiratory department's cutover from the legacy system of Clinivision to the Epic system for all the therapy documentation and charging. Jane came to try and be an advisor since she was the main builder of the Clinivsion system. She tried her best to be of help but it was pretty evident that the medication she was taking impaired her memory and cognitive skills. She was having trouble concentrating and was tiring rapidly. She wanted to try to continue but was unable to do so."

59. Margaret Burton states in part regarding Weiland:

"By 2005 she was having severe neck pain and spent many months working from home while lying flat in bed, then was officially disabled in 2006 after neck surgery. I had retired in 2005 so was able to help drive, shop, clean or do whatever was necessary to help her situation.

By 2007 I realized that nearly every day I was driving almost eight miles from my home to hers and then back to my home in order to help her in one way or another, After much discussion, we thought it would be easier for me if I just moved in with Jane for a while. Soon, it became apparent that the length of time I needed to live there would be longer than we had expected."

60. The eyewitness testimony ("eye witnesses") about physical difficulties observed first hand by these sophisticated and professional witnesses was never considered by Hartford's panel of medical vendors.

61. The eye witnesses testimony, on information and belief, was not given <u>any</u> weight or consideration in Hartford's rejection of the appeal.

62. None of the "eye witnesses" were contacted by Hartford regarding their statements or what they witnessed.

**HARTFORD WAS BIASED IN ITS TREATMENT OF MEDICAL INFORMATION.**

63. In 2010, Hartford set in motion a process of review which concluded in the

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

10

*Weiland v. Hartford*
CV New

1    termination of Weiland's benefits.

2    64. The process of review by Hartford <u>did not</u> include independent medical <u>examinations</u>.

65. Hartford's review process retained vendor doctors and/or a network of vendor doctors who perform assignments for insurance companies such as Hartford, aware that their payor is looking for opinions to rely on while deciding whether to deny or terminate benefits.

66. Hartford's review rejected the strongly expressed opinions of treating physicians Dr. Kwasman, Dr. Harkins, and Dr. Karl that Weiland was disabled.

67. In rejecting Weiland's appeal, Hartford again ignored the opinions of treating physicians.

68. Dr. Karl wrote in her medical note of November 19, 2010:

> "The disability carrier wanted me to do a comprehensive we go review of their documentation and had a detailed discussion with their representative a physician about the case. There were no arrangements made for use of my time in this fashion. And the representative called during office hours when I was busily seeing multiple patient's[sic]. For this reason I declined to discuss the case with the representative of the company. I have provided records to them which have been taken out of context in the letter of denial to the patient."

69. On May 2, 2011, Dr. Kwasman wrote to Hartford:

> "Your letter of April 21, 2011 alerting me to a call, which will come from an unnamed physician, has reached my attention. The best way to deal with such an inquiry is for the physician to send me a written list of questions that he would like me to respond to. I have addressed the issue of Ms. Weiland's disability several times, most recently in my January 25, 2011 letter to attorney Barry Kirschner. I continue to hold all of the opinions expressed in the January 25, 2011 letter.
>
> If the physician whom you refer to me has a specific question(s), it would be more efficient for me to know what it is and consider the matter before responding. This is preferable to a telephone interview where I am unaware of

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

11

*Weiland v. Hartford*
CV New

the questions to be asked.

I am happy to cooperate in this procedure. Please let me know what questions need a response."

70. Hartford elected not to elicit any further information from Dr. Kwasman, reversing its instructions to medical vendors and not receiving what it previously considered it needed--amplification of Dr. Kwasman's views on his patient of 30 years.

71. In May 2011, Dr. Karl sent an addendum report on an imaging study of Weiland's hands and foot which indicated severe erosive progression of her problems had occurred since 2007. Dr. Karl invited Hartford to set up a time to speak with her. Hartford characterized Dr. Karl's sending of the imaging study as its receipt of "unsolicited medical records."

72. Hartford's file includes a notation made June 14, 2011 which states:

"Peer vendor advised that contact has not been established with Dr. Karl despite the appointments set up by Dr. Karl's office to speak with peer reviewer.

Notified MLS Group to move on with the review if no contact is established after 6/17/11."

73. Weiland did not claim to be disabled for reasons of any mental or nervous disorder, but one of the vendor doctors is a psychiatrist .

74. Information supportive of disability which accumulated between the time of Hartford's surveillance videos and the termination of Weiland's benefits, such as Dr. Eichling's sleep studies, were given no weight.

75. Hartford set an unrealistic, even illusory, unobtainable standard of proof for disabilities caused by pain and medication side effects.

76. Treating orthopedic surgeon Dr. Katz was dismissed as offering no opinion on the ultimate question of disability. But, during 2010, Dr. Katz treated Weiland for pain in her right knee sufficient for him to recommend a surgical knee

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

12

*Weiland v. Hartford*
CV New

1  replacement.

2  77.  Statements in medical records such as Weiland does not need assistance with performances of her activities of daily living were interpreted as if the ability to wash, dress, and bath themselves is similar to the ability to perform sedentary executive administrative functions in continuous full-time employment.

78.  Hartford projected that Weiland's observed ability on one weekend to drive an automobile equates with her ability to work full time with reasonable continuity.

79.  On information and belief, Hartford and at least some of its medical panel member have already been judged to have given little weight to reliable evidence while using an opinion only relying on what these insurance vendors describe as "objective" evidence to establish an unreasonably (high) burden not called for in the relevant policy of insurance.

**SURVEILLANCE I**

80.  In January and February 2009, Hartford authorized and conducted four days of surveillance (Surveillance I) of Weiland.

81.  The product of watching Weiland for four days resulted in five minutes of film showing a very low level of activity.

82.  The conclusions within Hartford is that Surveillance I is supportive of Weiland's claim of disability.

83.  When Weiland requested her administrative file formally in 2010, after her benefits were terminated, documentation of Surveillance I was omitted from documents produced.

84.  A note within the file allowed inspection by Weiland's attorneys to realize there had been prior surveillance and to ask for all records of that surveillance.

85.  The lack of providing the surveillance materials and reports regarding Surveillance I reflects that the search for data by surveillance is only considered

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

13

*Weiland v. Hartford*
CV New

"successful" or useful to claim administration if the surveillance reveals activities tending to negate the claimed disability.

**SURVEILLANCE II**

86. Another round of surveillance was authorized and performed, and originally identified in Hartford's files as conducted during November 2009. The video depicted activity which actually occurred in December 2009.

87. The surveillance video is longer then one hour but less then one half of any normal work day.

88. The surveillance video was shared and viewed by treating physician Dr. Kwasman and Webber. Both Dr. Kwasman and Webber were contacted by a medical vendor hired by Hartford and asked their opinions about Weiland's disability. Both Dr. Kwasman and Webber stated that they had seen the video of surveillance and continued to believe Weiland was disabled.

89. Hartford's medical vendor acknowledged that:

> "Ms. Webber stated that she had seen the surveillance video and read the report. Dr. Kwasman also stated that he had read the report and seen the videos. Both report that they did not feel anything in the video or reports negated their previous assertion of claimant's disability."

90. Occupational expert Tigerman reviewed the entirety of the surveillance and concluded that nothing in the video tended to establish that Weiland's progressive conditions had improved to enable her to work full-time employment.

91. Tigerman assessed the situation in her report by stating (in part):

> "The Hartford chose to terminate disability in light of a progressive condition and used her one or two 'good days' to paint a picture of a person who can work despite medical evidence to the contrary."

92. The surveillance video was shot on a day where Weiland was attempting to

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ  85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

14

*Weiland v. Hartford*
CV New

reciprocate for a friend, Margaret Burton, who had provided extraordinary help to Weiland but who herself was temporarily disabled.

93. The surveillance video was used as an excuse to terminate a valid claim.

94. Hartford has a practice of exaggerating the capabilities of its disability participants who are subject to its surveillance.

95. Hartford has been criticized for this practice in cases before *Weiland*, such as *Montour v. Hartford*, 588 F.3d 623, 633-34 (9th Cir. 2009); *Bregman v. Hartford Life and Acc. Ins. Co.,* 2008 WL 4371927 (D. Conn. Sep 23, 2008); *Chan v. Hartford*, 2004 WL 2002988 (S.D.N.Y.); *Finley v. Hartford*, 2007 WL 4374417 (N.D. Cal.); *Geer v. Hartford Life & Accid. Ins. Co.*, 2009 U.S.Dist.LEXIS 48332 (E.D.Mich. June 9, 2009); *Gesling v. Group Long Term Disability Plan for Employees of Sprint,* 2010 U.S. Dist. LEXIS 24334 (S.D.Ind. March 16, 2010; *Hanusik v. Hartford Life Ins. Co.*, No. 06-11258, 2008 WL 28374, 4, (E.D. Mich. Jan 31, 2008); *Hyde v. Hartford*, 2009 WL 305560 (C.D. Cal. 2/5/09); *Post v. Hartford Insurance Company*, 501 F.3d 154, 165-68 (3d Cir. 2007 and on remand 2008 WL 4444240 (E.D. Pa. Oct 2, 2008.

96. Hartford has never initiated adequate internal procedures to stop its abuse of surveillance in its interpretation of its insureds' abilities to work.

97. On information and belief, Hartford has never disciplined its claims personnel for terminating or denying disability benefits based in part on exaggerated findings from surveillance.

98. On information and belief, Hartford has never disciplined its claims personnel following the Ninth Circuit opinion in *Montour* for terminating or denying disability benefits based in part on exaggerated findings from surveillance.

99. Hartford's medical vendor wrote:

"Despite the fact that claimant still does have a diagnosis of

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

15

*Weiland v. Hartford*
CV New

|   |   |   |
|---|---|---|
| 1 | | fibromyalgia and arthritis in the hands and wrists, there is nothing to support that the claimant was limited by these conditions according to the video surveillance." |
| 2 | | |
| 3 | 100. | Hartford's medical vendor wrote as if surveillance film, taken at a distance, of |
| 4 | | Weiland's hands was more authoritative than 2011 MRI reports confirming |
| 5 | | extensive progressive erosion in Weiland's hands since 2007, and the opinions |
| 6 | | of her rheumatologist, Dr. Karl. |
| 7 | 101. | The manner in which Hartford exaggerated the claimant's ability to perform full- |
| 8 | | time employment from video surveillance is part of a widespread practice by |
| 9 | | Hartford to favor its own interests against the participants. |
| 10 | 102. | Hartford's practices, including those in *Weiland*, violate the fiduciary duties |
| 11 | | owed to participants in ERISA Plans. |

**COUNT I**

**DECLARATORY JUDGMENT**

| | | |
|---|---|---|
| 14 | 103. | Weiland incorporates the facts alleged in all previous paragraphs as if fully set forth herein. |
| 16 | 104. | Defendants Hartford and TMC Plan acted with a conflict of interest to their fiduciary obligations. |
| 18 | 105. | Hartford has a structural conflict of interest because, the more it pays in benefits as a fiduciary, the less it gains for itself and its shareholders. |
| 20 | 106. | In addition to the structural conflict of interest, Hartford's conduct has been infected with a bias in favor of termination of Weiland's claim, including a system designed to ignore or overcome treating physicians and experts who support Weiland's claim for benefits. |
| 24 | 107. | Among the reasons to conclude that Hartford has acted with bias are: |
| 25 | | a.   Ignoring, minimizing, or misstating medical evidence in Hartford's evaluation of Weiland treating physicians; |

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

16

*Weiland v. Hartford*
CV New

  b. Ignoring the evidence regarding the amounts, effects, and increases in the medications to manage Weiland's pain, and the effect of these medications on her ability to concentrate and perform gainful occupation consistent with her expertise, training, and responsible positions which require the ability to focus and concentrate with great effectiveness;

  c. Misstating medical evidence for the purpose of justifying a termination of benefits, and denying the appeal to that termination;.

  d. Ignoring testimony from lay witnesses in a position to witness Weiland's attempts to work and use energy;

  e. Neglecting to factor in and give appropriate weight to the degenerative nature of Weiland's conditions and that it is highly unlikely for her medical conditions to show substantial improvement;

  f. Neglecting to give weight to the SSA determination of disability; or the opinion and report of vocational expert Tigerman; and

  g. Endorsing almost ridiculous opinions assuming the medication load prescribed to Weiland has no effect on her ability to concentrate and perform full-time employment and Weiland's ability to use her hands.

108. The facts warrant an order declaring that Weiland is entitled to back benefits, reinstatement, and continuing benefits.

  WHEREFORE this Court should enter its order declaring that Weiland is entitled to back benefits with interest, continuing benefits, attorneys' fees, costs, and all other relief applicable under law or equity.

  RESPECTFULLY SUBMITTED December 6, 2011.

      WATERFALL, ECONOMIDIS, CALDWELL,
      HANSHAW & VILLAMANA, P.C.

      By s/Barry Kirschner
      Attorneys for Plaintiff

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ 85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

17

*Weiland v. Hartford*
CV New

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that on December 6, 2011, I electronically transmitted the |
| 3 | attached document to the Clerk's Office using the CM/ECF System for filing and |
| 4 | transmittal of a Notice of Electronic Filing. |
| 5 | |
| 6 | s/Glades Guisinger |

WATERFALL, ECONOMIDIS
5210 E WILLIAMS CIR #800
TUCSON, AZ  85711
BKIRSCHNER@WECHV.COM
520-745-7810

BK/gg/12/6/11
Complaint FNL.wpd

18

*Weiland v. Hartford*
CV New